IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:08-cv-573-MEF |
| | ) |
| JAMARLO K. GUMBAYTAY, *et al.*, | ) (WO - PUBLISH) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

On July 17, 2008, the United States of America ("Plaintiff") brought suit against eleven defendants pursuant to Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. §§ 3601-3619 ("Fair Housing Act"). (Doc. #1). Over the course of amending its complaint three times, Plaintiff added nine defendants to the nine remaining original defendants. (Docs. #45, 107, & 168). Plaintiff alleges that defendant Jamarlo Gumbaytay ("Gumbaytay") engaged in a pattern of unlawful discrimination on the basis of sex in connection with the rental of the other defendants' properties. On January 15, 2010, defendant Lori Williams ("Williams") moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. #131). For the reasons set forth in this Memorandum Opinion and Order, that motion will be GRANTED in part and DENIED in part.

## II. JURISDICTION AND VENUE

Jurisdiction over Plaintiff's claims is proper under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3614(a). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both personal jurisdiction and venue.

## III. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed its initial complaint on July 17, 2008. It then filed amended complaints, adding defendants but not changing its allegations or claims, on January 7, 2009; November 23, 2009; and April 29, 2010. In its most-recent amended complaint, Plaintiff alleges the following: "At all times relevant to this action" Williams employed Gumbaytay as her agent to manage the property she owned at 720 Capri Street, Montgomery, Alabama 36105 ("720 Capri"). Rental unit(s) at that property are "dwellings" within the meaning of 42 U.S.C. § 3602(b). From at least 2005 to the present, Gumbaytay has been subjecting actual and prospective female tenants at that property to discrimination on the basis of sex, including severe, pervasive, and unwelcome sexual harassment. This includes "unwanted verbal sexual advances; unwanted sexual touching; unwanted sexual language; granting and denying

tangible housing benefits based on sex; and taking adverse action against female tenants when they refused or objected to his sexual advances." Williams is liable for the discriminatory conduct of Gumbaytay, her agent and manager. Additionally, Williams knew or should have known of Gumbaytay's discriminatory conduct but failed to take reasonable preventative or corrective measures. Williams may own or have owned other dwellings, where she engaged in similar conduct.

Plaintiff claims that this conduct—intentional, willful, and/or taken in reckless disregard for the rights of others—constitutes violations of the following provisions of the Fair Housing Act: 42 U.S.C. §§ 3604(a)–(c) and 3617. Plaintiff seeks a declaration that Williams violated the Fair Housing Act; an injunction preventing Williams from violating the Fair Housing Act in the future and from failing to take affirmative steps necessary to restore the victims of her past violations to the position they would have been absent her conduct; monetary damages to identifiable victims pursuant to 42 U.S.C. § 3614(d)(1)(B); and civil penalties against Williams to vindicate the public interest pursuant to 42 U.S.C. § 3614(d)(1)(C).

Evidence submitted by the parties shows the following:

Plaintiff has previously submitted several declarations from several women who have lived in properties managed by Gumbaytay, all describing various forms of discrimination based on sex. Valerie Manning ("Manning") rented the property at 720 Capri, beginning around January 2006, just before Williams bought the property. At the time, Eric Crews was

the property manager. Williams purchased 720 Capri in January 2006. Williams has never had an interest in any of the other properties mentioned in Plaintiffs' complaint. No other defendant in this lawsuit has an interest in 720 Capri.

Approximately three months after her tenancy began, Manning's water bills increased dramatically due to a leak. She called Eric Crews about the leak; however, Gumbaytay answered the phone. Gumbaytay said he could help with the leak, that he was Manning's "sugar daddy," and that Manning was too pretty to be having trouble.

In November 2006, Manning received a letter from Williams stating that Gumbaytay was taking over as property manager at 720 Capri. Gumbaytay then contacted Manning, telling her that Williams was increasing Manning's rent from $550 per month to $650 per month. Gumbaytay again told Manning she was pretty and that if she would "see him sometime" she would not have to worry about paying rent. Gumbaytay stated that he could pay her rent and buy things for her children.

Around this time, Gumbaytay began showing up at 720 Capri every Sunday, trying to get Manning to spend time with him and come over to his house. Gumbaytay would also sit in his car by 720 Capri and watch the house and often come by unannounced, including late at night. He would often make calls to 720 Capri, telling Manning that he was thinking about her and asking her what she was doing. At one point, Manning disconnected her phone because of Gumbaytay's calls.

On December 8, 2006, Gumbaytay went to 720 Capri to collect a partial rent payment.

He told Manning he could be her "sugar daddy" if she needed help with the rent because, "The lady that owns this house, she wants her money. The lady is a bloodhound for her money."

In June 2007, Gumbaytay sent Manning a "Notice of Default in Payment of Rent Warning Prior to Demand to Pay or Terminate Residential Lease" saying that Manning owed $900. Manning called Gumbaytay about that note, which bore his signature. Gumbaytay claimed that he had not written the note but told Manning he would pay the amount listed as due on the note if Manning "got with" him.

On July 24, 2007, Williams sent Manning a letter stating that she was taking over management of 720 Capri as of August 30. Williams says she fired Gumbaytay on July 24, 2007 because Williams had obtained information that Gumbaytay may have sexually harassed people who were not her tenants. Around August 10, 2007, Manning called Williams about problems at 720 Capri. Williams said it was the first she had heard of these issues, even though Manning had previously notified Gumbaytay, and said she would send over a repairman. However, the repairman never came. Manning then called Gumbaytay, thinking he was still the property manager until August 30. Gumbaytay told her he no longer managed 720 Capri but added that Manning did not owe Williams any rent above $550 per month because his statement that rent was $650 per month was "just what [Williams] had me do to you." Williams met with Manning in September 2007 and told her that rent was $650 per month. She also told Manning that she had met with her attorney, and her attorney told

her that she (Williams) was liable for Gumbaytay's actions.

Williams states in her affidavit that her meeting with Manning in September 2007 was the first time she heard allegations that Gumbaytay harassed Manning. She adds that Manning had Williams's contact information and never contacted her with allegations about Gumbaytay. Plaintiff disputes this point, submitting several documents sent to Manning that include contact information only for Gumbaytay's management company.

## V. DISCUSSION

### A.  42 U.S.C. § 3614(a)

This case is brought by the United States Attorney General ("Attorney General"). The Attorney General may bring this lawsuit against Williams in the following circumstances:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Fair Housing Act], or that any group of persons has been denied any of the rights granted by [the Fair Housing Act] and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

42 U.S.C. § 3614(a). Therefore, the Attorney General "has standing to sue" whenever he or she has reasonable cause to believe that "(1) there is an 'individual' or a 'group' pattern or practice violative of the Fair Housing Act or (2) whenever a group of persons has been denied rights granted by the Act and that denial raises an issue of general public importance."

*United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 122–23 (5th Cir. 1973).[1] Plaintiff alleges both of these requirements, though only one is necessary. *United States v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 444 (5th Cir. 1973). Though the Court must determine if at least one of these requirements is met, "a court's standard of review of the Attorney General's decision to bring an action under [42 U.S.C. § 3614(a)] should be a limited one," focusing on the "only requirement . . . that the Attorney General have *reasonable cause* to believe that such conditions exist." *Id.* at 445 (emphasis in original).

Williams argues that Plaintiff cannot survive summary judgment because Williams did not engage in a group pattern or practice violative of the Fair Housing Act. With regards to a group pattern or practice, the Fifth Circuit,[2] in a decision binding on this Court, found that proof of a conspiracy was not required for the Attorney General to bring a claim of a group pattern or practice of blockbusting,[3] one of the activities proscribed by the Fair Housing Act. *Bob Lawrence Realty*, 474 F.2d at 124. The Court noted that, at least in the

---

[1] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[2] The Court could not find a case where the Eleventh Circuit, since forming, has provided any relevant guidance in the interpretation of 42 U.S.C. § 3614(a) or its predecessor provisions. Nor could the Court find any binding case from the Fifth Circuit, with the exception of *Bob Lawrence Realty*, that provides any relevant guidance in the interpretation of 42 U.S.C. § 3614(a) or its predecessor provisions.

[3] Blockbusting is defined as "[f]or profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3604(e).

context of a residential area in the process of transitioning from being primarily one race to primarily another race, "[b]lockbusting by its very nature does not require concerted action or a conspiracy to wreck its pernicious damage." *Id.* at 124. The Court found this to be true because the "sociological phenomenon[4] of a transitional area" attracted individual realtors, acting as blockbusters, to come to the area and compete for market share. *Id.* The Court thus seemed to base its holding—"a 'group pattern or practice' of blockbusting is established when a number of individuals" engage in blockbusting—at least in part on aspects that may be peculiar to blockbusting. However, the Court also noted that "requiring proof of a conspiracy before the Attorney General has standing" to bring claims against an alleged

---

[4] The Fifth Circuit notes that the district court made the following findings at trial in that case:
> The evidence at the trial disclosed many illuminating things about what happens in a residential neighborhood when it becomes racially transitional. For example, if these cases are typical—and the court believes they are—the following consequences can be predicted as inevitable, and beyond dispute: First, a sense of panic and urgency immediately grips the neighborhood and rumors circulate and recirculate about the extent of the intrusion (real or fancied), the effect on property values and the quality of education. Second, there are sales and rumors of sales, some true, some false. Third, the frenzied listing and sale of houses attracts real estate agents like flies to a leaking jug of honey. Fourth, even those owners who do not sell are sorely tempted as their neighbors move away, and hence those who remain are peculiarly vulnerable. Fifth, the names of successful agents are exchanged and recommended between homeowners and frequently the agents are called by the owners themselves, if not to make a listing then at least to get an up-to-date appraisal. Constant solicitation of listings goes on by all agents either by house-to-house calls and/or by mail and/or by telephone, to the point where owners and residents are driven almost to distraction.

*Bob Lawrence Realty*, 474 F.2d at 124 n.13 (quoting *United States v. Mitchell*, 335 F. Supp. 1004, 1005–06 (N.D. Ga. 1971)).

group pattern or practice of blockbusting would "unjustifiably restrict the power which Congress gave to the Attorney General to proceed against group patterns or practices." *Id.*

This Court sees no reason to depart from the Fifth Circuit's rationale in *Bob Lawrence Realty*. Individual property owners may be attracted to hiring Gumbaytay as an agent for the purpose of increasing revenues through proscribed methods, resulting in group action. The Court will not unjustifiably restrict the Attorney General's ability to proceed against group action under 42 U.S.C. § 3614(a) by requiring proof of a conspiracy, especially where the Court is limited to reviewing only whether the Attorney General has "reasonable cause" to believe that group action exists. Plaintiff has produced evidence that Williams was one of several property owners who hired Gumbaytay as their property manager. This is sufficient for a finding on summary judgment that the Attorney General had reasonable cause to believe group action exists, regardless of whether Williams acted in concert with any of the other property owners.

However, the Court still must determine if Plaintiff has presented evidence raising an issue of fact about whether the group engaged in a "pattern or practice" of actions violative of the Fair Housing Act. While the actual number of discriminatory events is not determinative, the words "pattern or practice" were "intended to encompass more than an isolated or accidental or peculiar event." *Id.* at 124 (quoting *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) (internal quotations omitted)). Williams has introduced uncontroverted evidence that she only has one property and one tenant (Manning)

relevant to this lawsuit. However, Plaintiff has introduced evidence that Manning was subjected to continuing harassment from Gumbaytay; it was no isolated incident. *See Pelzer Realty Co.*, 484 F.2d at 445. Furthermore, Plaintiff has introduced evidence that Gumbaytay engaged in similar conduct with several tenants at several properties.

Plaintiff has only submitted evidence that Gumbaytay acted in a manner that violates the Fair Housing Act. The other defendants, including Williams, are all property owners who hired Gumbaytay as a property manager. But "it is well established that the [Fair Housing] Act provides for vicarious liability." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Under traditional vicarious liability rules, the property owners are liable for the acts of Gumbaytay as their agent or employee within the scope of his authority or employment. *Id.* Here, Plaintiff presents evidence that Gumbaytay's prohibited acts occurred within the scope of his authority or employment as a property manager of the relevant properties.

Plaintiff has easily satisfied its burden of producing evidence showing a material fact issue about whether the group of defendants "engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by" the Fair Housing Act. 42 U.S.C. § 3614(a). Therefore, summary judgment is inappropriate on this issue. Because Plaintiff need only satisfy one of the requirements under 42 U.S.C. § 3614(a), the rest of Williams's arguments about section 3614(a) are moot.

## B. Punitive Damages

Congress provided for the awarding of "monetary damages to persons aggrieved" in a Fair Housing Act case brought pursuant to 42 U.S.C. § 3614(a). In this context, "monetary damages" includes actual damages, damages for emotional distress, and punitive damages. *United States v. Rent America, Corp.*, 734 F. Supp. 474, 482 (S.D. Fla. 1990). Plaintiff and Williams disagree over the standard to be used in determining when to award punitive damages. The Eleventh Circuit has not discussed when punitive damages become available in Fair Housing Act cases.

In *Kolstad v. Am. Dental Health Ass'n*, the United States Supreme Court discussed when punitive damages are available in a Title VII case pursuant to 42 U.S.C. § 1981a(b)(1). 527 U.S. 526, 533–39 (1999). Section 1981a(b)(1) provides for punitive damages upon proof that the defendant discriminated "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The *Kolstad* Court interpreted the whole of § 1981a to show "a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination." *Kolstad*, 527 U.S. at 534. Looking to the terms "malice" and "reckless," the Supreme Court found that the focus should be on the actor's state of mind, not on the actor's conduct.[5] *Id.* at 534–35, 537–39. It then looked to *Smith v. Wade*, its earlier case on the availability of punitive damages in a

---

[5] The court did note, however, that "egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" *Kolstad*, 527 U.S. at 538.

lawsuit brought pursuant to 42 U.S.C. § 1983. *Id.* at 535–36 (citing *Smith v. Wade*, 461 U.S. 30 (1983)); *see id.* at 535 ("Congress looked to the Court's decision in *Smith* [*v. Wade*] in adopting this ['malice' and 'reckless'] language in § 1981a."). The Court in *Smith v. Wade* decided that actual malice was unnecessary for punitive damages, but, at a minimum, the plaintiff must show "recklessness in its subjective form." *Id.* at 536 (citing *Smith v. Wade*, 461 U.S. at 45–48). Applying the *Smith v. Wade* standard in the context of § 1981a, the Supreme Court in *Kolstad* held that, for punitive damages to be available, a defendant "must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. The Supreme Court, in keeping with congressional intent, recognized that there may be times where, under this standard, intentional discrimination does not give rise to punitive damages. *See id.* at 536–37.

The Eleventh Circuit has applied *Kolstad* in civil rights cases. *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) (Title VII); *Lambert v. Fulton Cnty., Ga.*, 253 F.3d 588, 597 (11th Cir. 2001) (42 U.S.C. § 1983). But, as noted above, the Eleventh Circuit has not set a standard for punitive damages in Fair Housing Act cases. The Court is convinced by the decisions of many other circuits that the *Kolstad* standard should be used for Fair Housing Act cases. *See Lincoln v. Case*, 340 F.3d 283, 291 (5th Cir. 2003); *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799–00 (6th Cir. 2002); *Badami v. Flood*, 214 F.3d 994, 997 (8th Cir. 2000); *Alexander v. Riga*, 208 F.3d 419, 430–31 (3d Cir. 2000); *cf. Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 266 (7th

Cir. 1997) (applying the *Smith v. Wade* standard for punitive damages in a Fair Housing Act decision issued prior to *Kolstad*).

However, the *Kolstad* Court recognized that an additional step was necessary in order to "impute liability for punitive damages" to a non-actor defendant. *Kolstad*, 527 U.S. at 539. This is because the Supreme Court felt that, in keeping with the common law, agency principles should limit vicarious liability for punitive damages. *Id.* at 541.

The Restatement (Second) of Agency summarized the common law rule that "[p]unitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if," among other things, "the agent was employed in a managerial capacity and was acting in the scope of employment." *Id.* at 542 (quoting Restatement (Second) of Agency § 217 C (1957)). The Supreme Court took issue with this rule in a Title VII context for a couple of reasons. First, the rule would expose employers making every effort to comply with Title VII to punitive damages for the discriminatory acts of all agents acting in a managerial capacity. *Id.* at 544. This result would be contrary to the general rule from *Kolstad*, since the *Kolstad* Court stated that punitive damages may only be awarded against a defendant exhibiting a reckless or malicious state of mind. *Id.* Second, the rule would reduce the incentive for employers to implement antidiscrimination policies. *Id.* at 545. Employees who are informed about Title VII are more likely than ignorant employees to satisfy the general *Kolstad* standard when they discriminate, because they are more likely than ignorant employees to "discriminate in the face of a perceived risk that

-14-

[their] actions will violate federal law." *Id.* at 536. Therefore, under the Restatement rule, which provides for broad vicarious liability for punitive damages, employers are more likely to be exposed to punitive damages when they inform their employees about federal law.

The Supreme Court chose to modify the Restatement rule in the Title VII context, to remove the perverse incentives it creates for employers. *Id.* at 545. The *Kolstad* Court stated that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* (inner quotations omitted). At least one circuit court has adopted this modified rule for vicarious liability for punitive damages in a lawsuit brought pursuant to the Fair Housing Act. *See Alexander*, 208 F.3d at 433–34 (finding that the duty of a landlord under the Fair Housing Act to not discriminate cannot be delegated to his or her employee, then remanding to the jury to consider whether, pursuant to *Kolstad*, the landlord "engaged in active anti-discrimination efforts sufficient to protect him" from punitive damages for the discriminatory acts of his employee). The Eleventh Circuit has applied this modified rule from *Kolstad* in civil rights cases. *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1205 (11th Cir. 2004); *Miller*, 277 F.3d at 1280.

In short, Gumbaytay is subject to punitive damages if he, at the least, discriminated in the face of a perceived risk that his actions will violate federal law. *See Kolstad*, 527 U.S. at 536. Williams is vicariously liable for those punitive damages under common-law agency

rules, unless Gumbaytay's discriminatory acts are contrary to Williams's good-faith efforts to comply with the Fair Housing Act. *See id.* at 545.

As the Court has already noted, Plaintiff has presented evidence showing that Gumbaytay's prohibited acts occurred within the scope of his agency relationship with Williams. However, the Court need not consider evidence, or lack thereof, of Gumbaytay's subjective mindset and Williams's good-faith efforts to comply with the Fair Housing Act, because the Eleventh Circuit has provided another layer of protection against vicarious liability for punitive damages. "'[P]unitive damages will ordinarily not be assessed against employers with only constructive knowledge' of harassment; rather, punitive damages may only be considered in cases where the 'discriminating employee was high[] up the corporate hierarchy' or where 'higher management countenanced or approved [his] behavior.'" *Miller*, 277 F.3d at 1280 (quoting *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999)).[6]

Here, there is no corporate hierarchy to consider. As to the second consideration, Plaintiff has introduced no evidence that Williams "countenanced or approved" Gumbaytay's

---

[6] The Eleventh Circuit previously said that this rule exists "[i]n part because of the egregious-conduct requirement" for punitive damages. *Dudley*, 166 F.3d at 1323. In *Kolstad*, decided just a few months after *Dudley*, the Supreme Court stated that the availability of punitive damages stems from state of mind rather than egregiousness of conduct. *Kolstad*, 527 U.S. at 534–35, 537–39. However, the Eleventh Circuit later reiterated its "constructive knowledge" rule for vicarious liability for punitive damages while discussing *Kolstad*, indicating that the Circuit believes the rule is justified even in the absence of any egregious-conduct requirement. *Miller*, 277 F.3d at 1280.

alleged behavior. No evidence submitted to this Court indicates that Williams even knew of Gumbaytay's alleged treatment of Manning or anybody else before she hired him, when she hired him, during the bulk of his time as Williams's property manager, or at any time until just before she fired him. And that firing itself indicates that Williams disapproved of Gumbaytay's behavior. Plaintiff has failed to show that there is a genuine issue of material fact regarding Williams's liability for punitive damages under Eleventh Circuit precedent. *Cf. Boswell v. Gumbaytay*, No. 2:07-cv-135, 2009 WL 1515872, at *6–*7 (M.D. Ala. June 1, 2009).

Plaintiff argues that the Court should not apply the Eleventh Circuit rule from *Miller* because that case discusses hostile environment harassment while this case deals with, in addition to hostile environment harassment, a situation where Manning suffered tangible economic harm as a result of not succumbing to Gumbaytay's alleged harassment. Plaintiff relies on *Burlington Industries, Inc. v. Ellerth* for this argument. 524 U.S. 742 (1998). In that case the Supreme Court did create an affirmative defense for vicarious liability "to liability or damages" for a hostile environment claim. *Id.* at 765. This defense was not available when the "harassment culminates in a tangible . . . action" against the person complaining of harassment. *Id.* Therefore, Plaintiff correctly states that the Supreme Court has made a distinction between these two harassment scenarios.

However, the Supreme Court also dealt with a situation where the plaintiff sued over tangible adverse action one year later in *Kolstad*. 527 U.S. at 531. Yet the *Kolstad* Court did

not mention the distinction made in *Burlington Industries* when discussing vicarious liability for punitive damages. *Id.* at 539–45. This is despite regular citations to *Burlington Industries* throughout *Kolstad*. The Court is left to presume that *Burlington Industries* does not apply to vicarious liability for punitive damages. Additionally, the Eleventh Circuit in *Miller* cited to *Dudley* for the proposition that vicarious liability for punitive damages is only available where, among other things, the employer approved of the employee's harassing behavior. *See Miller*, 277 F.3d at 1280 (quoting *Dudley*, 166 F.3d at 1323). Unlike *Miller*, a case of hostile environment, in *Dudley* at least one of the plaintiffs suffered tangible adverse employment actions. *See Dudley*, 166 F.3d at 1319. So the Eleventh Circuit has not accepted the distinction made by Plaintiff.

## VI. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Williams's motion for summary judgment (Doc. #131) is GRANTED in part and DENIED in part. It is granted in that Williams is not vicariously liable for punitive damages for any actions taken by Gumbaytay found to violate the Fair Housing Act. It is denied in all other respects.

DONE this the 9th day of September, 2010.

                                                /s/ Mark E. Fuller
                                    CHIEF UNITED STATES DISTRICT JUDGE